UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| PERCY BONNER, | ) |
| Plaintiff, | ) |
| v. | ) No. 21-cv-2474 |
| THOMAS DART, Sheriff of Cook County, and COOK COUNTY, | ) Judge April M. Perry |
| Defendants. | ) |

**OPINION AND ORDER**

In the spring of 2020, Percy Bonner ("Plaintiff") was held in the Cook County Department of Corrections (the "CCDOC"), became sick with Covid-19, and was admitted to Stroger Hospital. Plaintiff claims that the physical restraints the Cook County Sheriff used on him during that hospital stay violated his Fourteenth Amendment rights. Plaintiff also claims that Defendants violated his Fourth Amendment rights because they allegedly unreasonably delayed his administrative release. Before the Court is Defendants' motion for summary judgment. For the reasons set forth below, the motion is granted in part and denied in part.

BACKGROUND

On February 27, 2020, Plaintiff was processed into the CCDOC for possession of a controlled substance. Doc. 99 at 9. On March 26, 2020, while still detained, Plaintiff tested positive for Covid-19. *Id.* at 10. On April 6, 2020, Plaintiff was admitted to Stroger Hospital for symptoms related to Covid-19 including shortness of breath, fever, cough, and a recent episode of diarrhea. *Id.*; Doc. 108 at 8. Plaintiff spent his time at the hospital in Ward 75, an area for hospitalized detainees. Doc. 108 at 5; Doc. 99 at 11. Ward 75 has six rooms to hold six inmates. Doc. 108 at 5. It is monitored by correctional staff at all times. *Id.* To enter Ward 75, one must

pass a desk staffed by a correctional officer. *Id.* Moreover, at least one correctional officer is assigned to monitor each room on the ward. *Id.* Those officers are required to keep watch on their assigned inmate at all times and must carry a firearm. *Id.*

While at Stroger Hospital, Plaintiff stayed by himself in a room in Ward 75.[1] Doc. 99 at 11. From the time when Plaintiff was admitted on April 6, to when he was released from custody on April 14, Plaintiff was shackled to his hospital bed. Doc. 108 at 9–10. One shackle restrained Plaintiff's right arm to the bed and another shackle restrained his left leg to the bed. Doc. 96-11 at 39. The shackles limited Plaintiff's ability to use both hands, and Plaintiff testified that he was only able to extend his right hand to about his chest area. *Id.* Plaintiff testified that the shackles were on tight and caused sharp pain and bruising on his wrist and leg. *Id.* at 48.

During his hospital stay, Plaintiff could not go to the bathroom to relieve himself or to shower. Doc. 108 at 6. Because he was not able to go to a bathroom, Plaintiff defecated on himself three times. *Id.* at 9. After these incidents, Plaintiff sought the assistance of the nursing staff and to have his shackles removed but ended up waiting several hours for assistance and was never unshackled. Doc. 96-11 at 39, 44. Plaintiff pleaded with the nursing staff for soap so that he could shower and eventually was provided with towels and soap with which to wash himself from his hospital bed. *Id.* at 46. Once provided with these supplies, however, Plaintiff was only able to clean himself with one hand as his other was still shackled. *Id.* at 47. After one incident of defecating on himself, a female nurse helped to clean Plaintiff but had to cut his clothes off to do so. *Id.* at 45. Plaintiff testified that these experiences were deeply humiliating, and that he would not "wish it on my worst enemy." *Id.* at 41. Plaintiff was in the hospital several days before he was provided with a portable toilet or bed pan, and testified that the nurse who ultimately

---

[1] Plaintiff testified that his room in Ward 75 had no windows. Doc. 108 at 8. This fact is disputed, but it appears to be undisputed that any window that may have been present was designed not to open. Doc. 99 at 8; Doc. 108 at 16.

provided it commented that they "don't even have [bed pans] on the floor" and that she had to go to another floor to retrieve it. *Id.* at 41, 47.

Plaintiff first complained about the shackles early in his stay, either the first or second day. Doc. 108 at 8; Doc. 96-11 at 40. During the entirety of his stay, he complained at least twelve times. Doc. 108 at 6. The nursing staff repeatedly told Plaintiff that the removal of Plaintiff's shackles was up to the Sheriff. Doc. 96-11 at 40. Plaintiff described feuding with the nurses over the conditions of his confinement, stating that they had "heated" arguments. *Id.* at 41. At one point, Plaintiff became angry and threw the call button against the wall. *Id.* at 45.

On April 10, 2020, Plaintiff's bond was paid. Doc. 108 at 15. On April 14, Plaintiff was unshackled, transferred to another room, and released from custody on electronic monitoring. Doc. 96-11 at 46. Plaintiff remained at Stroger Hospital until the following day when he was discharged. Doc. 108 at 16.

The CCDOC maintains a written policy relating to the shackling of detainees in hospital settings. That policy provides:

> When an inmate is being held at any outlying medical care facility, the inmate should be secured in a manner relative to the totality of the circumstances. In most instances, a hospital bed should be used in the following manner:
> - One end of the shackles will be placed on the inmate's leg and the other end will be secured to the frame of the bed.
> - The inmate's hand, opposite their shackled leg, shall be secured to the frame of the bed.
> - The belly chain will then be secured to the frame of the bed with a padlock.

Doc. 96-1 at 4. The express policy also provides, under the "CONSIDERATIONS" section: "An inmate should be allowed to use the bathroom upon request and when it is medically safe to do so. If there is a risk to safety or security, the inmate use [sic] of a bed pan should be considered." Doc. 99 at 2.

On May 7, 2021, Plaintiff filed the instant suit. In his amended complaint Plaintiff alleges that Defendants' policy and practice applied to Plaintiff during his hospitalization was excessive and violated the Fourteenth Amendment. Doc. 34. Plaintiff also alleges that the unreasonable delay in administratively releasing him on bond violated his Fourth Amendment rights. After discovery was substantially completed, Defendants brought the present motion for summary judgment.

**LEGAL STANDARD**

A court shall grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56. A dispute as to material facts is genuine, and summary judgment will be denied, "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the initial responsibility of identifying "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); FED. R. CIV. P. 56(c). Ultimately, however, the party who bears the burden of proof on any issue may not rest on the pleadings and must affirmatively present some evidence to support its claims. *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008). Even so-called "self-serving" testimony from the non-moving party, if "based on personal knowledge or firsthand experience," can be "evidence of disputed material facts." *Berry v. Chicago Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010).

## ANALYSIS

As a preliminary matter, the Court grants summary judgment to Defendant on Plaintiff's Fourth Amendment claim because Plaintiff has acquiesced to summary judgment on that claim. *See* Doc. 103 at 2 n.1. As to Plaintiff's Fourteenth Amendment claim, Defendants argue that the CCDOC's written policy regarding restraints for hospitalized detainees is constitutional. Because Plaintiff brings suit against Cook County and Defendant Thomas Dart in his official capacity, Plaintiff must establish that the constitutional violation he was allegedly subjected to "came about as a result of a custom or policy established by the officials." *See Klebanowski v. Sheahan*, 540 F.3d 633, 637 (7th Cir. 2008). In this context, three forms of unconstitutional policies or customs are recognized:

> (1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; or (3) an allegation that the constitutional injury was caused by a person with final policy-making authority.

*Id.* (quoting *Palmer v. Marion Cnty.*, 327 F.3d 588, 595 (7th Cir. 2003)).

Plaintiff does not cite any of these three provisions, and it is unclear whether he is challenging the constitutionality of the express policy or rather the widespread practice of how the policy was implemented. This matters, as the standards of proof are different depending on whether one challenges a policy or a practice. *See Calderone v. City of Chicago*, 979 F.3d 1156, 1164 (7th Cir. 2020) ("[Where] the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the policy and the constitutional deprivation."). But whether Plaintiff challenges the express policy or the policy as

it is put into practice by Defendants, there are genuine disputes of material fact that preclude summary judgment in Defendants' favor.

Pre-trial detainees like Plaintiff are subject to qualitatively different protections than convicted prisoners. *See Miranda v. Cnty. of Lake*, 900 F.3d 335, 352 (7th Cir. 2018) ("[The] Supreme Court has been signaling that courts must pay careful attention to the different status of pretrial detainees."). Under the Fourteenth Amendment's due process protections, pre-trial detainees may not be punished because "punitive measures [] may not constitutionally be imposed prior to a determination of guilt." *See Bell v. Wolfish*, 441 U.S. 520, 537 (1979). In *May v. Sheahan*, the Seventh Circuit addressed the argument that the use of shackles on hospitalized detainees constitutes a punitive measure in violation of the Fourteenth Amendment. The Court stated that the "use of bodily restraints constitutes punishment … if their use is not rationally related to a legitimate non-punitive government purpose or they appear excessive in relation to the purpose they allegedly serve." *May v. Sheahan*, 226 F.3d 876, 884 (7th Cir. 2000). Acknowledging that "shackling all hospital detainees reduces the risk of a breach of security and thus furthers a legitimate non-punitive government purpose," the Court still held that a policy of "shackling an AIDS patient to his or her bed around the clock, despite the continuous presence of a guard" was "plainly excessive in the absence of any indication that the detainee poses some sort of security risk." *Id. May* was decided at the motion to dismiss stage, but the Seventh Circuit suggested that to prevail at a later stage the Cook County Sheriff would need to "produce evidence justifying both his shackling policy in general and his shackling of [plaintiff] in particular." *Id*. Ultimately, the question of excessiveness is a question as to whether the plaintiff was treated in an objectively unreasonable manner, based upon "the facts and circumstances" of the case. *Thomas v. Dart*, 39 F.4th 835, 842 (7th Cir. 2022).

This Court reads *May* to require an individualized determination as to the security risk of a guarded hospitalized detainee before 24/7 shackling will pass constitutional muster. Both Plaintiff and Defendants seem to agree with this premise. Defendants assert that this is exactly what the CCDOC policy requires when it states that "the inmate should be secured in a manner relative to the totality of the circumstances." The problem with Defendants' argument is that there is evidence in the record that this is not how the Sheriff's Office is reading the policy, or at the very least, that it is not how the Sheriff's Office is applying the policy as a matter of practice. Rather, Plaintiff has submitted evidence from which a reasonable jury could infer that no individualized assessment is occurring at all before shackling ill detainees.

Specifically, Sheriff's Officer Joseph Spriggs testified that it is "standard procedure" for male detainees to be handcuffed and shackled at Stroger Hospital. Doc. 99-1 at 20–21. Officer Spriggs also testified that it is "the Sheriff's policy" to use "handcuffs and shackles for everyone except pregnant females." *Id.* at 21. When shown the policy and asked specifically about what the "totality of the circumstances" means, Officer Spriggs testified:

> if a guy had no arm or the arm was bad – badly wounded, those are the – those take – that would take in consideration the totaltation [sic] of the person because he couldn't be shackled correctly. So you have to do something different, and so we have to come up with something different, maybe a different arm or a different leg. But if that wasn't the case, it's just standard handcuffs and shackles.

Doc. 99-1 at 22. This testimony suggests that to the officers, "secured in a manner relative to the totality of the circumstances" refers not to *whether* a detainee should be shackled, but only *how* a detainee should be shackled. In other words, officers are not conducting any individualized risk assessment at the time they shackle hospitalized detainees. And it is not just Officer Spriggs'

testimony: Defendants have acknowledged that the policy is applied "in the same way for all detainees despite their security clearance level (minimum, medium, maximum)." Doc. 99 at 6.[2]

Defendants argue that even though there is no evidence Plaintiff's individual circumstances were considered, there was no Fourteenth Amendment violation in this case because it was objectively reasonable to shackle Plaintiff around the clock. In so arguing, Defendants point out that Plaintiff had Covid-19 and therefore could not have a guard inside his room to watch him. Defendants argue that this made it more likely for Plaintiff to be able to escape or hurt someone. Defendants also argue that while Plaintiff was sick, he was capable of walking without assistance and therefore still a threat. Finally, Defendants note that Plaintiff was argumentative with the nursing staff and has a criminal history that includes several felonies.

For his part, Plaintiff points to other facts from which one could infer that he was not a security risk. Most notably, for the last four days of Plaintiff's hospital stay his bond had been posted and the only reason he was still in custody was because his illness prevented his release from being processed. Plaintiff also asserts that he was overweight, had constant breathing problems, and was weak from Covid-19. Plaintiff further argues that Ward 75 was highly secure, with one armed guard observing Plaintiff from outside his door at all times and at least one other armed guard at the front of the ward. Given that the Court is not allowed to weigh the evidence and must draw all reasonable inferences in favor of Plaintiff, the Court believes Plaintiff has demonstrated a genuine dispute as to whether it was objectively reasonable to shackle him the entire time he was at the hospital.

---

[2] Defendants have further acknowledged that only doctors or supervisors can request that a detainee not be shackled. Doc. 99 at 6. It is unclear when a supervisor would make such a request. Drawing all reasonable inferences in Plaintiff's favor, this also indicates that the officers interacting with the detainee do not have the authority to decide not to shackle a detainee.

The Court notes that the problem in this case is not just that Plaintiff was constantly shackled, but that Plaintiff was also denied bathroom access. Being handcuffed to the bed and denied a bathroom or a bed pan meant that Plaintiff was forced to defecate on himself repeatedly and then sit in his own waste. The CCDOC's express policy provides: "An inmate should be allowed to use the bathroom upon request and when it is medically safe to do so. If there is a risk to safety or security, the inmate use [sic] of a bed pan should be considered." Doc. 99 at 2. Being allowed to use a bathroom, or at the very least a bed pan, is significant to one's dignity. "Dignity serves an important balancing function alongside the legitimate safety and management concerns of jails and prisons" and without "the counterweight of dignity" a jail could presumably justify any variety of "unseemly measures" for security reasons. *Mulvania v. Sheriff of Rock Island Cnty.*, 850 F.3d 849, 858 (7th Cir. 2017). Defendants note that the Covid-19 pandemic "altered the usual practice" of detainees being given bathroom trips. Doc. 95 at 8; Doc. 107 at 6 ("Had this not occurred at the height of a global pandemic, the policy expressly allows for handcuffs to be removed to allow the detainee to use the bathroom."). A jury could consider this to be a reasonable explanation for why no bathroom trips were allowed, but it does not explain why the policy or practice did not require that detainees be given bed pans. Under these circumstances, a reasonable factfinder could conclude that Defendants' proffered security concerns did not justify their treatment of detainees. *See, e.g.*, *Mulvania*, 850 F.3d at 858 (reversing grant of summary judgment and reasoning that a reasonable trier of fact could find jail policy excessive given the need to balance the counterweight of plaintiffs' dignity interests, even if policy turned out to be rationally related to a legitimate interest). And, despite Defendants' argument to the contrary, a reasonable jury could further find that sitting in one's feces for hours is a cognizable injury.

Finally, an aside is warranted regarding the historical data Defendants have submitted, which includes evidence of fifteen incidents over a ten-year period where detainees committed violent acts while in hospital settings. This Court accepts, as did the Seventh Circuit in *May*, that there is a legitimate government interest in securing pre-trial detainees. But the Court believes that *May* forecloses the argument that a legitimate government interest in security is enough to constantly shackle all hospitalized detainees, regardless of their risk level or medical condition. *See Moore v. Dart*, No. 13 CV 3276, 2014 WL 7205575, at *3 (N.D. Ill. Dec. 18, 2014) (rejecting defendants' argument that individualized assessment is not required under *May*). Thus, even giving Defendants the "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to" maintain security, *Bell v. Wolfish*, 441 U.S. 520, 547 (1979), the Court believes that it is for the jury to decide whether the policies and practices implemented by the Sheriff were excessive and in violation of the Fourteenth Amendment when applied to Plaintiff.

## CONCLUSION

For the foregoing reasons, Defendants' motion is granted as to Plaintiff's Fourth Amendment claim and denied as to Plaintiff's Fourteenth Amendment claim.

Dated: April 7, 2025

_____
APRIL M. PERRY
United States District Judge